Durfee, Judge,
delivered the opinion of the court:*
Douglass Bros., Inc. brings this action to recover the sum of $32,247.82, the balance of payment due under a contract with defendant. Plaintiff completed the work called for by the contract, but because of plaintiff’s subcontractor’s negligence, fire destroyed part of defendant’s property. Defendant withholds the stated amount from plaintiff to compensate itself for the loss.
*291 Douglass contracted to install new transformers and secondary lines carrying electricity at the Holloman Air Force Base in New Mexico. The actual work was performed by the L. G. Simon Electric Company. In the course of installing the new equipment, Simon’s employees misconnected two wires. A result of this negligence was a fire in two buildings Nos. 295 and 297 on the Air Force Base. The work called for by the contract was completed and plaintiff was paid all but the $32,247.82 sued for in this proceeding. The Air Force withheld this amount, estimating this to be the amount of damage caused to the buildings, on the basis of paragraph 31 of the General Provisions of the Contract involved. This provision states in part:
* * * the Contractor shall be responsible for all loss or destruction of or damage to property that occurs as a result of his [sic] fault or negligence in connection with the prosecution of the work * * *.
After the fire in buildings 295 and 297, an Air Force Board conducted an investigation as to its cause and the extent of the destruction. This ex farte investigation determined that the cause of the fire was carelessness on the part of the L. G. Simon Electric Company’s personnel. Neither plaintiff nor Simon Company was afforded an opportunity to be represented at the board’s proceedings, or to present evidence to the board. On the basis of this investigation, the contracting officer presented Douglass with the claim for damages. Upon plaintiff’s failure to pay the claim and the subsequent withholding of payment to plaintiff, Douglass filed its claim for $32,247.82 with the General Accounting Office. The Comptroller General disallowed the claim. The Armed Services Board of Contract Appeals eventually rendered an opinion on plaintiff’s claim, dismissing it on the ground that the ASBCA lacked jurisdiction because the claim had been submitted to, and denied by the Comptroller General.
It is admitted that Simon’s employees were negligent, that this negligence is imputed to plaintiff, and that plaintiff is otherwise liable for negligent destruction of defendant’s property under paragraph 31 of the contract. The issues between the parties concern defendant’s negligence. Was *292 defendant careless in the manner in which it grounded the wires in buildings 295 and 297; was this a substantial factor contributing to the property destruction; does this alter plaintiff’s responsibility under paragraph 31, or render the paragraph inoperative?
Plaintiff has completed the work called for by the contract, but defendant has failed to respond with the agreed-upon consideration. Having thus caused a breach of contract, defendant is brought to court to account for its failure to pay. The defense is plaintiff’s negligence and its liability therefor under paragraph 31. Without question, plaintiff may plead and prove that defendant’s own negligence caused all or part of the damage in order to overcome this defense. The defense and counter-defense of negligence, however, does not make this suit for the contract price a tort action. It remains a suit for breach of contract, and involves the interpretation to be given paragraph 31 of the agreement. This is not a case sounding in tort; we have no jurisdiction over such controversies.
Paragraph'31 states that the contractor shall be responsible for defendant’s loss that occurs as a result of the contractor’s “fault or negligence.” This must mean the sole fault of the contractor or its agents or employees. It does not include the fault of third parties, and it cannot include the fault of defendant’s own agents or employees. The contract would have to state in clear and unequivocal terms, the unusual provision that would allow defendant to so pass on the liability for its own negligence. If defendant has negligently caused damage to its property, it must bear this loss itself; it may not withhold from plaintiff any part of the contract price to compensate for the loss.
In the case at bar, we must first determine, under a contract provision, what damage plaintiff is responsible for, and hold it liable. If defendant’s carelessness was operative at the same moment and it added to and extended the damage done, we must make the effort to separate this additional destruction. Plaintiff cannot be held for that also. Under the terms of paragraph 31, plaintiff is not absolved from its wrongdoing because of defendant’s concurrent fault, yet de *293 fendant cannot bold Douglass Bros., Inc. liable for the entire loss to which its own carelessness contributed.
The fire broke out because of the misconnection between the secondary line and service drops for the lighting services in buildings 295 and 297 made by the L. Gr. Simon Company. The misconnection caused an overloading of current on the wires leading into the buildings and on to the light fixtures. Ordinarily, any excess current will be taken off and away by a ground wire which is attached to a nearby water pipe from the lighting switch. The misconnection caused the current overload to be so great that it exceeded the carrying capacity of the ground wires and caused them to overheat to the point of incandescence.
Defendant’s carelessness relates to the ground wire in building 295. Douglass Bros., Inc. no longer contends that defendant was negligent with respect to the other structure. A No. 6' wire had been used in building 295 as a ground wire, and it had been connected to a nearby water pipe from the second light switch in the north portion of the building. A No. 2 wire, which is larger than a No. 6, and which can bear a greater current, should have been used instead, and it should have been connected from the main switch to a nearby water pipe. A ground wire from the main switch increases the possibility of minimizing the damage to the building in case of overheating of the ground wire caused by excessive current. The size of the ground wire is usually dictated by the size of the service entrance wires that carry the electricity from the power pole outside the building, to the main switch within the building. Considering the size of the service entrance wires to building 295, a No. 6 ground wire was insufficient to carry off the excessive current to which those wires might reasonably be expected to become subject.
The connection of the ground wire to the second switch in the north portion of the building is itself insufficient basis upon which to conclude that defendant’s negligence was a substantial contributing factor to the property loss in building 295. Had the connection been made properly, at the main switch, fire probably would have occurred in any event, because of plaintiff’s misconnection outside and defendant’s use of a No. 6 ground wire inside. But such damage as was *294 done to the computers and plotting boards housed in the north portion of the building would have been avoided. The extent of damage to these items amounted to $16,945.32. Other damage may have occurred near the main switch instead, had the ground wire been connected there. The facts are not fully developed in this regard.
The lighting system in building 297 was grounded from the main switch, and with a proper size wire, and the fire occurred around this main switch. The matter is not free from doubt, but we assume that if the system were properly installed in building 295, the result would have been the same. The No. 6 wire in building 295 then, only hastened combustion. But there is nothing in the record that shows defendant would have suffered the loss it did near the second switch had the ground wire not been imprudently placed there. The evidence leads more to the conclusion that had the ground wire been properly located the loss to defendant would have been less.
Plaintiff is entitled to recover the contract price for the work done less an amount of money which will adequately compensate defendant for the damage to building 295, caused by the carelessness of L. G. Simon Company’s employees. To the extent that defendant’s failure to properly ground the lighting system increased and extended the damage caused by plaintiff’s negligence, to that extent plaintiff shall not be liable to compensate defendant under paragraph 31 of the contract. Plaintiff is responsible only for the destruction caused by its own agents and employees.
An additional amount of money equal to the total damage caused to building 297 shall also be taken from the compensation otherwise due plaintiff. Plaintiff’s misfeasance alone was operative in causing damage to this structure.
This case is remanded to the Commissioner pursuant to Rule 38(c) with instructions to recommend that plaintiff receive the sum of $32,247.82, less $200, the total amount of damage done to building 297, and less an amount which is equal to the loss due to the destruction to building 295 caused by plaintiff’s negligence, exclusive of defendant’s negligence.
*295 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Texas. It is engaged in the electrical contracting business.
2. (a) On May 4, 1953, the plaintiff entered into contract No. AF 29 (600)-330 (which will usually be referred to hereafter in the findings as “the contract”) with the defendant, represented by a contracting officer of the United States Air Force. Under the contract, the plaintiff undertook to furnish the labor and materials required for the conversion of the existing electrical system at the Holloman Air Force Base, New Mexico, to a higher voltage.
(b) Paragraph 31 of the general provisions of the contract expressly stated that (with certain exceptions that are not pertinent to this litigation):
* * * the Contractor shall be responsible for all loss or destruction of or damage to property that occurs as a result of his [sic] fault or negligence in connection with the prosecution of the work * * *.
(c) The price to be paid the plaintiff under the contract was based on the number of units of work performed in accordance with the contract. The contract price was initially estimated at $147,503.48. The final contract price amounted to $151,015.40.
3. The electrical system at the Holloman Air Force Base consisted, first, of primary lines, which took the electric current from the source of supply and carried it at a relatively high voltage to the different areas of the base. Then, at various places near the points where the electricity was to be used, transformers were installed and were connected to the primary lines for the purpose of taking the electric current from the primary lines and converting it into a lower voltage that was appropriate for the operation of the facilities in the particular local areas. Next, secondary lines were connected to the transformers and carried the electric current from the transformers at the stepped-down voltage to the *296 immediate vicinity of the various buildings that were to receive service. Then, service drops were connected to the secondary lines just outside the several buildings in order to carry the electric current from the secondary lines into the buildings for the operation of the electrical equipment.
4. The plaintiff entered into a subcontract with the L. G. Simon Electric Company for the latter to perform the labor that was required under the contract.
5. The labor that was to be performed under the contract included (among other things) the installation of new transformers and new secondary lines, and the removal of the old secondary lines. The contract did not involve the replacement of the existing service drops or any work on the wiring inside the various buildings at the base.
6. The work under the contract was performed on an area-by-area basis. When the new transformer and the new secondary line which were to serve a particular geographical area of the base had been installed, the old transformer in that area was disconnected from the primary line, thereby temporarily depriving the area of electric current; the service drops into the several buildings within the area were disconnected from the old secondary line and the old secondary line was removed; the service drops were then connected to the new secondary line; and the new transformer was thereafter connected to the primary line, thereby energizing the new secondary line and the service drops within the area.
7. (a) Two buildings that are of special concern in the present litigation were located near each other within one of the geographical areas at the Holloman Air Force Base. They were designated as buildings 295 and 297.
(b) The secondary line which, prior to the conversion of the electrical system at the base, provided electrical service for the area in which buildings 295 and 297 were located was a 4-wire line that consisted of a neutral wire and three phase wires, or “hot” wires.
8. (a) Prior to the conversion of the electrical system at the Holloman Air Force Base, a power pole that was located near the southeast corner of building 295 supported (among other things) the 4-wire secondary line that served the particular area and a '3-wire service drop that carried *297 electric current from the secondary line to building 295 for the operation of lights inside the building.[1]
(b) The 4-wire secondary line mentioned in paragraph (a) of this finding was attached to the power pole by means of a 4-spool rack, the neutral wire being attached to the top, or No. 1, spool in accordance with the customary practice, and the three “hot” wires being connected to the No. 2, the No. 3, and the No. 4 spools.
(c) The 3-wire service drop mentioned in paragraph (a) of this finding consisted of a neutral wire and two phase wires, or “hot” wires. These three wires were attached to the power pole by means of a 4-spool rack. It is customary in the electrical industry, where a 3-wire service includes a neutral wire, for the neutral wire to be attached to the top, or No. 1, spool of a 4-spool rack and for the two “hot” wires to be attached to the No. 2 and No. 3 spools. On the other hand, if a 3-wire service consists of three “hot” wires, it is customary for the wires to be attached to the No. 2, the No. 3, and the No. 4 spools of a 4-spool rack, the top, or No. 1, spool being left vacant. Hence, in the case of a 3-wire service, the positioning of the wires on a 4-spool rack is supposed in the industry to indicate whether the service does or does not include a neutral wire. However, contrary to the usual practice, the neutral wire of the 3-wire lighting service drop to building 295 was attached to the No. 2 spool of the 4-spool service-drop rack on the power pole, and the two “hot” wires of the service drop were attached to the No. 3 and the No. 4 spools. The top, or No. 1, spool of the service-drop rack was left vacant. The neutral wire of the service drop was connected from its position on the No. 2 spool of the service-drop rack to the neutral of the secondary ; and the two “hot” wires of the service drop were connected to two of the “hot” wires of the secondary.
9. (a) The three wires of the service drop referred to in finding 8 ran from the power pole mentioned in that finding to a nearby portion of building 295, where they were con *298 nected to three service entrance wires. Each of these wires was 250,000 circular mils in size. The service entrance wires entered building 295 through a conduit and ran to the main switch, which was located in the south portion of building 295. From the main switch, the electric current was carried by three wires through the attic of the building to a second switch, which was located in the north portion of building 295. From the second switch, the current was carried over branch circuits to the lighting fixtures in the building.
(b) The neutral wire of the lighting service in building 295 was grounded by means of a No. 6 wire that led from the second switch to a nearby water pipe. This was not a proper grounding of the service, from the standpoint of safety. Under the standard of reasonable care for the safety of the persons and property located in building 295, the neutral wire of the lighting service should have been grounded at the main switch by means of a No. 2 wire (which is larger than a No. 6 wire) leading from the main switch to a nearby water pipe.
10. (a) Prior to the conversion of the electrical system at the Holloman Air Force Base, a power pole that was located southeast of building 297 supported the 4-wire secondary line that served the particular area and a 3-wire service drop that carried electric current from the secondary line to building 297 for the operation of lights in the building.[2]
(b) The 3-wire service drop mentioned in paragraph (a) of this finding consisted of a neutral wire and two “hot” wires.
(c) The three wires of the service drop mentioned in this finding ran from the power pole to a nearby portion of building 297, where they were connected to three service entrance wires. The service entrance wires entered building 297 through a conduit and were connected to the main switch in the building. The service drop wires and the service entrance wires that served building 297 were not larger than No. 6 in size.
*299 (d) The neutral of the lighting service to building 297 was properly grounded by means of a No. 6 wire leading from the main switch in the building.
11. (a) By September 26, 1953, the new transformer and the new secondary line which were to serve the area of the Holloman Air Force Base that contained buildings 295 and 297 had been installed, and the change-over to the new electrical system in the particular area was scheduled to be made on that day. In the vicinity of buildings 295 and 297, the new secondary line had been installed on the same power poles that supported the old secondary line and the service drops mentioned in findings 8 and 10. The new secondary line was attached to the power pole southeast of building 295 by means of a 4-spool rack, the neutral wire of the new secondary being on the No. 1 spool and the three “hot” wires being on the No. 2, No. 3, and No. 4 spools, in accordance with the customary practice.[3] As part of the change-over process, personnel of the L. G. Simon Electric Company disconnected the old transformer from the primary line, thereby temporarily depriving the area of electric current. The service drops into the several buildings within the area, including buildings 295 and 297, were then disconnected from the old secondary line, and the old secondary line was removed.
(b) Although it was obvious to the personnel of the L. G. Simon Electric Company who disconnected the service drops at buildings 295 and 297, previously mentioned in findings 8 and 10, from the old secondary line that the top wire of each service drop was a neutral (since such personnel disconnected that wire from the neutral of the old secondary line), and (at least with respect to the top wire of the service drop at building 295) that it was improperly positioned on the No. 2 spool of the 4-spool service-drop rack, the personnel who made the disconnection did not take any action to call these matters to the attention of the other representatives of the L. G. Simon Electric Company on the job.
(c) Later on September 26, 1953, personnel of the L. G. Simon Electric Company connected the service drops at the *300 various buildings within the area, including the service drops at buildings 295 and 297 mentioned in findings 8 and 10, to the new secondary line. The persons who made the recon-nections at buildings 295 and 297 were different from those who had previously disconnected the service drops at those buildings. They erroneously assumed that the top wire of each of the service drops mentioned in findings 8 and 10 was a “hot” wire, and, accordingly, they connected that wire to the No. 2 wire of the new secondary line, which was a “hot” wire. The two “hot” wires of each of these service drops were connected to the remaining “hot” wires of the new secondary line (i.e., No. 3 and No. 4).
12. Shortly after the improper connections referred to in finding 11 were made, the new transformer that was to serve the area in which buildings 295 and 297 were located was connected to the primary line, thereby energizing the new secondary line and the various service drops within the area with 120 volts of electricity. Because of the improper connections referred to in finding 11, fires broke out in buildings 295 and 297, with resulting damage to property of the defendant.
13. (a) A board which had previously been appointed by the commanding officer of the Holloman Air Force Base, and which consisted of three Air Force officers and a civilian employee of the Air Force, convened at the base on September 30, 1953, to investigate the cause of the fires mentioned in finding 12 and the extent of the damage that had been done to buildings 295 and 297 and to the equipment and supplies in those buildings. The report of the board indicates that the members visited the buildings for the purpose of inspecting the damage, that they considered written statements which had been taken by the staff judge advocate of the base from Air Force personnel and employees of the L. G. Simon Electric Company, and that they considered other pertinent documentary exhibits. In its initial report, the board attributed the fires to carelessness on the part of the L. G. Simon Electric Company’s personnel, and estimated that the total loss to the Government as a result of the fires would amount to $81,422.
(b) The board mentioned in paragraph (a) of this finding *301 reconvened on December 15, 1953, and prepared a supplemental report on the basis of further data that were then available to the board. The supplemental report contained, inter alia, the following statement:
3. * * * The final total cost to the Government of the fire in Buildings 295 and 297 is now established at $32,247.82.
(c) No hearing was held by the board. Neither the plaintiff nor the L. G. Simon Electric Company was afforded an opportunity to be represented at the board’s proceedings or to present evidence to the board.
14. On the basis of the actions that were taken by the board mentioned in finding 13, the contracting officer submitted to the plaintiff, by means of letters dated January 5 and 15, 1954, a claim in the amount of $32,247.82 under paragraph 31 of the general provisions of the contract, stating that “the Contractor shall be responsible for all loss or destruction of or damage to property that occurs as a result of his [sic] fault or negligence in connection with the prosecution of the work.”
15. The plaintiff having failed to pay the claim referred to in finding 14, the Air Force, in making payments under the contract, withheld the sum of $32,247.82 to cover the amount of its claim. Payments aggregating $118,767.58 out of the total contract price of $151,015.40 were made to the plaintiff by the Government.
16. (a) On August 24, 1954, the plaintiff filed with the General Accounting Office a claim for $32,247.82 as the balance due under the contract.
(b) The Comptroller General disallowed the plaintiff’s claim on August 24,1955.
17. (a) In a letter to the contracting officer dated September 16,1955, the plaintiff requested:
* * * that the contractor and subcontractor [L. G. Simon Electric Company] be given the right of a hearing before you as contracting officer, and that you weigh all of the evidence on both sides impartially, and after hearing all of the evidence that you render a complete decision on the dispute in accordance with what you consider the evidence to be. * * *
*302 (b) The contracting officer’s reply dated September 28, 1955, to the letter mentioned in paragraph (a) of this finding stated:
* * * that any final decisions and determinations made concerning final settlement is [sic] not within the authority of the Contracting Officer * * *.
18. On September 29, 1955, the plaintiff took an appeal to the Armed Services Board of Contract Appeals from the refusal of the contracting officer to make a decision.
19. On May 17, 1956, the Armed Services Board of Contract Appeals rendered a decision stating in part as follows:
It is difficult to avoid the conclusion that the contracting officer has made no appealable decision and that his failure to do so flowed from a misapprehension of his function under the “Disputes” article. The appeal is therefore dismissed without prejudice to the rights of either party and the case is remanded to the contracting officer for the pronouncement of a proper decision from which an appeal can be taken under the contract if the contractor is so advised and desires, unless the parties can stipulate as to what the decision would be, in which event the present appeal may be set for hearing upon its merits. * * *
20. On September 24, 1956, the contracting officer and the plaintiff entered into the following stipulation:
It is stipulated * * * that in the event the case had been submitted to him for determination, the Contracting Officer’s decision would have been to deny the contractor’s claim in full; and it is further stipulated and agreed that the ASBOA should proceed to hear the matter on its merits pursuant to the aforementioned ruling.
21. On June 30, 1958, the Armed Services Board of Contract Appeals rendered an opinion dismissing the plaintiff’s appeal, on the ground that the ASBOA lacked jurisdiction because the plaintiff’s claim had been submitted to and denied by the Comptroller General.
22. On August 5, 1958, the plaintiff instituted the present case in the Court of Claims.
23. The plaintiff has not assigned the claim on which this action is based, or any part of such claim.
24. The plaintiff completed the work called for by con *303 tract No. AF 29 (600)-330 in a satisfactory mannei’, and such work was accepted and approved by the contracting officer.
25. The evidence in the record warrants the following inferences, and it is found: that the fires in buildings 295 and 297, as indicated in finding 12, resulted because the No. 6 ground wires in those buildings were compelled, as a consequence of the improper connections mentioned in finding 11, to carry a heavier load of electrical current than they were designed or able to carry safely; that the two ground wires became overheated to the point of incandescence because of the overloading; and that the two ground wires thereupon ignited nearby flammable portions of the respective buildings.
26. (a) The damage that was done to building 295 as a result of the fire mentioned in finding 12 occurred in the north and center portions of the building and amounted to $19,626.70. In addition, damage to the extent of $102.50 was done to miscellaneous equipment in building 295, and damage to the extent of $16,945.32 was done to three computers and two plotting boards housed in the north portion of building 295.
(b) The damage that was done to building 297 as a result of the fire mentioned in finding 12 amounted to $200.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on its claim. This case is remanded to the Commissioner pursuant to Buie 38 (c) with instructions to recommend that plaintiff receive the sum of $32,247.82, less $200, the total amount of damage done to building 297, and less an amount which is equal to the loss due to the destruction to building 295 caused by plaintiff’s negligence, exclusive of defendant’s negligence.
On March 26,1964, the following report, including supplemental findings of fact and recommendation, was submitted by the trial commissioner under Buie 38(c) in accordance with the court’s decision:
*304 In an opinion dated July 12, 1963, ante, p. 289, the court held that the plaintiff was entitled to recover a portion of the amount sued for, and remanded the case to the commissioner for a determination of the amount of recovery pursuant to Rule 38(c). As the parties subsequently were unable to reach an agreement on the amount due the plaintiff under the court’s decision, it was necessary to hold a further trial in connection with the question of the amount of recovery.
The case arose out of a contract between the parties under which the plaintiff converted the electrical system at the Holloman Air Force Base, New Mexico, to a higher voltage. The contract price was $151,015.40.
After the plaintiff had completed the work called for by the contract, the defendant withheld from the plaintiff $32,247.82 out of the contract price because a subcontractor of the plaintiff, while performing certain phases of the work on behalf of the plaintiff, misconnected some electrical wires and fires resulted in two Government buildings designated as Nos. 295 and 297. The defendant’s action in withholding-part of the contract price was based upon a provision of the contract which stated that:
* * * the Contractor shall be responsible for all loss or destruction of or damage to property that occurs as a result of his fault or negligence in connection with the prosecution of the work * * *.
The present action was instituted for the recovery of the $32,247.82 referred to in the preceding paragraph.
In its decision of July 12, 1963, the court found that the plaintiff’s subcontractor was negligent in misconnecting the wires, and that such negligence was imputed to the plaintiff. The court further found that under the provision of the contract previously quoted, the plaintiff was solely responsible for — and the defendant was justified in withholding an amount equivalent to — the damage that was done to building 297.
With respect to the damage that was done to building 295 and its contents, the court dealt with the problem of whether the defendant itself was negligent in connection with the grounding of the lighting service in that building, and, if *305 so, to wbat extent the defendant’s negligence contributed to the damage that was done to building 295 and its contents.
The evidence indicated that the three wires of the lighting service drop to building 295 ran from an outside power pole to a nearby portion of the building, where they were connected to three service entrance wires. All these wires were 250,000 circular mils in size. The service entrance wires entered building 295 through a conduit and ran to the main switch, which was located in the south portion of building 295. From the main switch, the electric current was carried by wires through the attic of the building to a second switch, which was located in the north portion of building 295. From the second switch, the current was carried over branch circuits to the lighting fixtures in the building.
The neutral wire of the lighting service in building 295 was grounded by means of a No. 6 wire that led from the second switch (i.e., the one located in the north portion of the building) to a nearby water pipe.
The fire in building 295 resulted when the No. 6 ground wire in the building was compelled, as a consequence of the misconnection previously mentioned, to carry a heavier load of electric current than the No. 6 wire was designed or able to carry safely. The ground wire became overheated to the point of incandescence because of the overloading, and ignited a nearby flammable portion of the building. The fire gained headway before it was discovered, and damaged the north and center portions of the building.
The fire in building 295, together with the large amount of water that was used in extinguishing the fire after it was discovered, damaged building 295 to the extent of $19,626.70. In addition, damage to the extent of $17,047.82 was done to equipment in the part of the building affected by the fire (electronic equipment was damaged to the extent of $16,945.32 and miscellaneous equipment was damaged to the extent of $102.50).
The court said that the defendant was careless in connection with the grounding of the lighting service in building 295. The court’s discussion of this point was in part as follows:
*306 Defendant’s carelessness relates to the ground wire in building 295. * * * A No. 6 wire had been used in building 295 as a ground wire, and it had been connected to a nearby water pipe from the second light switch in the north portion of the building. A No. 2 wire, which is larger than a No. 6, and which can bear a greater current, should have been used instead, and it should have been connected from the main switch to a nearby water pipe. A ground wire from the main switch increases the possibility of minimizing the damage to the building in case of overheating of the ground wire caused by excessive current. The size of the ground wire is usually dictated by the size of the service entrance wires that carry the electricity from the power pole outside the building, to the main switch within the building. Considering the size of the service entrance wires to building 295, a No. 6 ground wire was insufficient to carry on the excessive current to which those wires might reasonably be expected to become subject.
The connection of the ground wire to the second switch in the north portion of the building is itself insufficient basis upon which to conclude that defendant’s negligence was a substantial contributing factor to the property loss in building 295. Had the connection been made properly, at the main switch, fire probably would have occurred in any event, because of plaintiff’s misconnection outside and defendant’s use of a No. 6 ground wire inside. But such damage as was done to the computers and plotting boards housed in the north portion of the building would have been avoided. The extent of damage to these items amounted to $16,945.32. Other damage may have occurred near the main switch instead, had the ground wire been connected there. The facts are not fully developed in this regard.
* * * The matter is not free from doubt, but we assume that if the system were properly installed in building 295, the result would have been the same. The No. 6 wire in building 295 then, only hastened combustion. But there is nothing in the record that shows defendant would have suffered the loss it did near the second switch had the ground wire not been imprudently placed there. The evidence leads more to the conclusion that had the ground wire been properly located the loss to defendant would have been less.
The case was remanded to the commissioner under Rule 38 (c) with instructions:
*307 * * * to recommend that plaintiff receive the sum of $32,247.82, less $200, the total amount of damage done to building 297, and less an amount which is equal to the loss due to the destruction to building 295 caused by plaintiff’s negligence, exclusive of defendant’s negligence.
The court’s decision is understood as holding that the defendant was negligent with respect to building 295 (1) by grounding the lighting service at the second switch in the north portion of the building rather than at the main switch in the south portion of the building, and (2) by using a No. 6 wire rather than a No. 2 wire for this purpose. The court believed that, while this negligence on the part of the defendant was not a contributing cause of the fire in building 295 (since the court believed that a fire would have occurred in building 295 anyway, even if the system had been properly installed in that building), the negligent placement of the ground wire at the second switch in the north portion of the building caused the damage from the fire in building 295 to be greater than the damage would have been if the lighting service had been properly grounded at the main switch in the south portion of the building and the fire had originated there.
The problem under Rule 38(c), therefore, is to make an estimate regarding the amount of damage that would have resulted to building 295 and its contents if the fire had originated due to the overheating of a ground wire connected to the main switch in the south portion of the building.
The evidence indicates that the south portion and the north portion of building 295 were similar in design, shape, and size; that they were constructed of the same sort of material; and that they were otherwise similar with respect to the factors affecting flammability, fire damage, and fire control. Therefore, it is reasonable to infer that if the fire in building 295 had originated due to the overheating of a ground wire connected to the main switch, the fire would have been discovered at about the same time that the actual fire was discovered; that the extinguishment of such a fire in the south portion of the building would have required amounts of time, effort, and water equivalent to the time, effort, and water that were required to extinguish the actual *308 fire; and that such, a fire would have resulted in about the same amount of damage to the structure of the building before being extinguished that resulted from the actual fire.
It thus appears that under the hypothetical situation with which we are concerned in the proceedings pursuant to Eule 38(c), the damage to building 295 itself would have been equivalent to the figure of $19,626.70 that represented the damage that was done to building 295 by the actual fire.
However, the record, as supplemented by the further trial, does not indicate to what extent, if any, there was equipment in the portion of building 295 near the main switch that would have been affected by a fire caused by the overheating of a ground wire connected to the main switch. Consequently, it must be inferred that there would have been no damage to equipment resulting from such a fire.
It is my conclusion, therefore, that the negligence of the plaintiff’s subcontractor (attributable to the plaintiff) should be regarded as having caused the damage to building 295 in the amount of $19,626.70, as well as the damage to building 297 in the amount of $200, and that the defendant’s negligence should be regarded as having caused the-damage to the miscellaneous equipment and the electronic equipment in the north portion of building 295.
On that basis, the plaintiff is entitled to a judgment in the amount of $12,421.12 (i.e., the $32,247.82 that was withheld, less $200 representing the amount of the damage that was caused to building 297 by the negligence of the plaintiff’s subcontractor, and less $19,626.70 representing the amount of the damage that was caused to building 295 by the negligence of the plaintiff’s subcontractor).
SUPPLEMENTAL FINDINGS OP FACT
27. The south portion and the north portion of building 295 were similar in design, shape, and size; both portions of the building were constructed of the same sort of material; and they were otherwise similar with respect to the factors affecting flammability, fire damage, and fire control.
28. It is reasonable to infer — and, therefore, it is found— that if the fire of September 26, 1953, in building 295 had *309 originated due to the overheating of a ground wire connected to the main switch in the south portion of the building, the fire would have been discovered at about the same time that the actual fire of that date was discovered; that the extinguishment of such a fire in the south portion of the building would have required amounts of time, effort, and water equivalent to the time, effort, and water that were required to extinguish the actual fire; and that such a fire in the south portion of the building, together with the effort and water necessary to extinguish it, would have caused about the same amount of damage to the structure of building 295 as resulted from the actual fire. Therefore, the damage to building 295 resulting from such a fire would have been equivalent to the figure of $19,626.70 that represented the damage that was done to building 295 by the actual fire.
29. The record before the court does not indicate to what extent, if any, there was equipment in the south portion of building 295 that would have been affected if the fire of September 26, 1953, had originated due to the overheating of a ground wire connected to the main switch. Therefore, an inference is warranted — and it is found — that the damage resulting from such a fire would have been restricted to the building itself.
30. The negligence of the plaintiff’s subcontractor (attributable to the plaintiff) caused the damage to building 295 in the amount of $19,626.70, as well as the damage to building 297 in the amount of $200.
31. The defendant’s negligence in connection with the grounding of the lighting service in building 295 by means of an inadequate No. 6 wire connected to the second switch in the north portion of the building, instead of using for this purpose a No. 2 wire at the main switch in the south portion of the building, caused the damage that was done to miscellaneous equipment and to the computers and plotting boards.
On July 2,1964, the court issued an order noting that the parties had filed notices that no exceptions would be taken to the trial commissioner’s report and that the court would *310 accordingly adopt the supplemental findings of fact and accept the trial commissioner’s recommendation, and it was ordered that judgment be entered for the plaintiff for $12,421.12.

 Trial Commissioner Mastín G. White at the direction of the court, prepared an opinion and recommended conclusions of law in this case, which were of substantial assistance.

 There were other service drops to building 295 from power poles located to the west of the building. However, those service drops were not significant from the standpoint of the issues involved in the present litigation. Therefore, references in subsequent findings to the service drop at building 295 mean the service drop that is mentioned in finding 8.

 There was another service drop to building 297 from another power pole located south of the building, but that service drop was unimportant from the standpoint of the present case. Consequently, references in subsequent findings to the service drop at building 297 mean the service drop that is referred to in finding 10.

 The evidence is not clear as to how the new secondary line, the old secondary line, and the service drop were attached to the power pole that was located southeast of building 297.